**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

| | |
|---|---|
| STEVE DUDLEY and BETH DUDLEY, individually and on behalf of all others similarly situated, )))) | |
| Plaintiffs, )) | |
| vs. )) | No. 03-L-1539 |
| PUTNAM INTERNATIONAL EQUITY FUND, and PUTNAM INVESTMENT MANAGEMENT, LLC, )))) | |
| Defendants. ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS ACTION WITH PREJUDICE**
**AND MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

Come now Plaintiffs, and in opposition to Defendants' motion to dismiss with prejudice and for their motion for leave to file a First Amended Complaint pursuant to 735 ILCS § 5/2-616(a), state as follows:

1.  Plaintiffs have not previously amended their Complaint which they originally filed on November 10, 2003.

2.  With their proposed First Amended Complaint (submitted herewith and more specifically described below at paragraph 21(a) – (j)), Plaintiffs would eliminate all allegations of (and all claims based on any allegations of) the kind which the Appellate Court in *Kircher v. Putnam Funds Trust*, 2010 WL 108262 (5th Dist., Jan. 6, 2010) (and other courts) have found to run afoul of the Securities Litigation Uniform Standards Act (SLUSA), including:

- any conduct by Defendants or third parties covered by SLUSA;

- any injuries caused by illegal market timing or "arranged" market timing (assuming there was any);

- any injuries caused by Defendants' preferential treatment of anyone;

**Exhibit I**

- any injury to Defendants' property;

- any injuries which were sustained by all mutual fund shareholders (as opposed to some shareholders and not others).

3.  With the elimination of all such allegations and claims, Plaintiffs have strictly and narrowly limited their claims to:

- only a claim for common law negligence or "mismanagement";

- only allegations of conduct by Defendants (or others) which is not covered by SLUSA;

- only injuries caused by *legal* market timing and "inadvertent" market timing;

- only injuries that were not caused by Defendants preferential treatment of anyone;

- only injuries to Plaintiffs' and class members' separate property (i.e., property separate from Defendants' property);

- only injuries sustained by some but less than all mutual fund shareholders;

- only injuries directly to Plaintiffs and class members, and not any injuries they sustained only derivatively of some injury to Defendants' property which would have been an injury sustained by *all* shareholders proportionally to their mutual fund share holdings

4.  Defendants have moved for dismissal of this action with prejudice on the basis of the Appellate Court's January 6, 2010, opinion in *Kircher*.

5.  The Appellate Court, however, only directed this Court to "dismiss the [*Kircher*] action. The Court did not direct this Court either to dismiss the action *with prejudice* or to enter judgment for Defendants, despite the fact Defendants moved for judgment on the pleadings in *Kircher*.

6.  First, there is no basis for dismissing Plaintiffs' *individual* claims with prejudice or for entering judgment on Plaintiffs' *individual* claims because SLUSA bars only dismissal of "covered class actions" when they are based upon certain specified allegations. 15 U.S.C. § 78bb(f)(1). SLUSA does not prevent Plaintiffs from pursuing *any* of their claims individually.

7.   Plaintiffs seek leave to amend their complaint in order to eliminate all allegations, claims or theories of recovery that, according to the Appellate Court, offend SLUSA and in order to expressly and narrowly limit the scope of their claim. For instance, Plaintiffs propose to exclude illegal market timing, such as "arranged" market timing, and limit their claims only to legal "non-arranged" and "inadvertent" market timing. *See* proposed First Amended Complaint at ¶ 69. *See also* paragraph 21(a) – (j) below (describing amendments in detail).

8.   Amendment after a SLUSA dismissal is permissible under both Illinois and federal law.

9.   First, amendment of a complaint after an appeal is permissible under Illinois law. *Clemons v. Mechanical Devices Co.*, 202 Ill.2d 344, 353-54 (2002) (after reversal, if "it appears from the opinion that the grounds of reversal are of a character *to be obviated by subsequent amendment of the pleadings* or introduction of additional evidence, *it is the duty of the trial court* to permit the cause to be re-docketed and then *to permit amendments to be made* and evidence to be introduced on the hearing just as if the cause was then being heard for the first time") (emphasis added) (quoting *Roggenbuck v. Breuhaus*, 330 Ill. 294, 298 (1928)).

10.   "Plaintiff should not be denied the opportunity to amend his complaint because the invalidity of his case … was determined first in the reviewing courts rather than at the trial level." *Id*. at 357.

11.   Second, when SLUSA requires dismissal of a complaint because it contains allegations of the kind that SLUSA forbids, SLUSA does not prohibit amendment of the complaint to eliminate such allegations or to plead state law claims that do not run afoul of SLUSA. *U.S. Mortg., Inc. v. Saxton*, 494 F.3d 833 (9th Cir. 2007).

> Congress included no express prohibition against amendment and no court has held that SLUSA completely and categorically bars any amendment of the complaint following removal. Moreover, there is precedent in the district courts of this circuit for the view that a plaintiff *may* avoid SLUSA dismissal through amendment. For example, in

*Schuster v. Gardner,* 319 F.Supp.2d 1159 (S.D. Cal. 2003), the district court permitted plaintiffs to amend their complaint to avoid SLUSA dismissal. The court credited the plaintiffs' argument that any federal claim in the original complaint was inadvertently pled, allowed amendment, and remanded the resulting state-law action to state court. *Id.* at 1164. ...

... [D]istrict courts that have confronted the issue have also recognized the inequity of dismissing otherwise valid and viable state law claims on the ground that plaintiff pled—perhaps inadvertently—a cause of action that may be construed as federal in nature. In light of the statutory silence on the issue in SLUSA, the existence of competing policy rationales, and the fact that the granting or denial of leave to amend is ordinarily a matter left to the discretion of the district court, we hold that SLUSA does not prohibit amendment of the complaint after removal.

*Id.* at 842 -843. *Accord Green v. Ameritrade, Inc.,* 279 F.3d 590 (8th Cir. 2002) (affirming district court's grant of leave to amend after SLUSA dismissal).

12. In fact, the refusal to allow amendments of a complaint to assert state law claims not precluded by SLUSA is reversible error. *W.R. Huff Asset Management Co. v. Kohlberg, Kravis, Roberts,* 2006 WL 3544920 (11th Cir. 2006). The procedural history of *W.R. Huff* was very similar to that of the present case. The case was originally filed in Alabama state court in August 1999. "Thereafter the case had [a] long and torturous procedural history .... During this extended odyssey, ... [t]he main issue in the case pertained to whether the Securities Litigation Uniform Standards Act of 1998, preempts Huff's state law claims." *Id.* at *1. During the seven years leading up to the 2006 appeal, the plaintiff had filed three amended complaints, and it was the district court's denial of leave to file a fourth amended complaint which gave rise to the appeal in the Eleventh Circuit.

Although this case has had an undeniably long procedural history, the delays to which it has been subject have generally been no fault of Huff's. The removals to bankruptcy court, for example, and corresponding stays were beyond Huff's control. The "passage of time, without anything more, is an insufficient reason to deny leave to amend."

*Id.* at *3 (quoting *Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1490 (11th Cir.1989)). Thus, the Eleventh Circuit found there would be no "waste of judicial resources" to permit Huff to file the fourth amended complaint because no "judge found the Third or Fourth Amended

Complaints to be preempted by SLUSA." *Id. Accord Beckett v. Mellon Investor Serv. LLC*, 2009 WL 1336735 at *2 (9th Cir. 2009) ("Because Beckett could amend his class complaint to allege claims that are not preempted, we reverse the district court's decision to dismiss with prejudice").

13. "At any time before final judgment amendments may be allowed on just and reasonable terms, … changing the cause of action or …, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought … ." 735 ILCS § 5/2-616(a). *See also Smith v. Central Ill. Regional Airport*, 207 Ill.2d 578, 584-85, 802 N.E.2d 250, 254 (2003) ("it is well established that a cause of action should not be dismissed with prejudice unless it is clear that no set of facts can be proved under the pleading which would entitle the plaintiff to relief").

14. As Judge Spomer wrote in *Cretton v. Protestant Mem. Med. Ctr., Inc.*, 371 Ill.App.3d 841, 309 Ill.Dec. 422 (5th Dist. 2007), "[t]his section is to be liberally construed so that cases are decided on their merits and not on procedural technicalities. Whether amendment of pleadings is to be allowed is a matter within the sound discretion of the court, and absent an abuse of this discretion, a court's determination will not be overturned on review." *Id.* at 860, 309 Ill.Dec. at 443 (quoting *Pry v. Alton & Southern Ry. Co.*, 233 Ill.App.3d 197, 213 (5th Dist.1992)). *Accord Savage v. Mui Pho*, 312 Ill.App.3d at 557, 245 Ill.Dec. 318, 321 (5th Dist. 2000).

15. "Doubts about allowing amendments should be resolved in favor of amendment …." *Cretton*, 371 Ill.App.3d 860, 309 Ill.Dec. 422. at 443, 309 Ill.Dec. at 443 (quoting *Pry v. Alton & Southern Ry. Co.*, 233 Ill.App.3d 197, 213 (5th Dist.1992)). *Accord Savage*, 312 Ill.App.3d 553, 556-57, 245 Ill.Dec. 318, 321 (5th Dist. 2000).

16. "In considering whether to allow an amendment to the pleadings, the trial court should consider, among any other relevant factors, whether the amendment would cure the defect in the pleadings, whether the amendment would surprise, and thereby unfairly prejudice, the opposing party, whether the motion to amend is timely, and whether the party had previous opportunities to amend the pleadings. Amendments should be permitted if they further the ends of justice." *Kern v. DaimlerChrysler Corp.*, 364 Ill.App.3d 708, 712, 302 Ill.Dec. 125, 127-28 (5th Dist. 2006) (citing *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill.2d 263, 273 (1992)). *Accord Clemons*, 202 Ill.2d at 355-56.

17. "The most important consideration is whether the allowance of the amendment furthers the ends of justice." *Savage v. Mui Pho*, 312 Ill.App.3d 553, 557, 245 Ill.Dec. 318, 321 (5th Dist. 2000).

18. "If a plaintiff can state a cause of action by amending the pleadings, a case should not be dismissed with prejudice on the pleadings. Only when no set of facts entitling a plaintiff to relief can be proved under the pleading may a reviewing court affirm a motion to dismiss." *Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co., Inc.*, 264 Ill.App.3d 878, 885, 202 Ill.Dec. 367, 373 (1st Dist. 1994).

19. Plaintiffs propose to limit their claims (and the injuries for which they seek recovery) to those based upon conduct that injured Plaintiffs *before* Defendants made any representations (and thus before Defendants could have made any "misrepresentations" to anyone) about the Net Asset Value (NAV) or mutual fund share prices or values.

20. Plaintiffs also propose to limit their claims to those for injuries caused only by Defendants' negligent failure to prevent market timing in the Fund, and Plaintiffs explicitly

disavow any claim of injury based on any failure to disclose or any omission of fact (material or otherwise) and disavow any claim of injury based on "manipulation."

21. Specifically, Plaintiffs propose the following amendments:

a. ***Proposed amendment***: Explicit allegations that Plaintiffs seek no recovery for injuries, if any, that may have been caused by Defendants' representations (or "***mis***representations," if any) of the Fund's Net Asset Values (NAVs), per share NAVs, value of the Fund (or its shares), or prices of the Fund's shares. *See* proposed First Amended Complaint ¶¶ 73-82.

   ***Defect in original allegations***: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *6 (5th Dist., Jan. 6, 2010) ("we find that the plaintiffs' allegations of stale pricing are, in essence, allegations of a negligent or willful and wanton misrepresentation of value"); *In re Mut. Funds Inv. Litig.* (*Mehta v. AIG Sunamerica Life Assurance Co.*), 437 F.Supp.2d 439, (D. Md. 2006) ("'The element of a misrepresentation or omission of a material fact is satisfied when a plaintiff alleges a misrepresentation concerning the value of the securities sold or the consideration received in return.' That is exactly what the plaintiffs have done here, despite their emphatic disavowal of their prior explicit allegations of misrepresentation, and their pared-down amended complaint.") (citation omitted).

   ***How the proposed amendment cures the prior defect***: These amendments make clear that irrespective of whether Defendants made any misrepresentations of value or price, Plaintiffs do not allege any such misrepresentations, do not seek recovery for any such misrepresentations, and thus disavow any claim based on any such misrepresentations of value or price. Plaintiffs' claim is thus limited to the dilution injuries caused by Defendants' negligent execution of trade orders at a per share NAV based on the closing prices of foreign securities in the fund portfolio, but not on Defendants' later representation (if any) of that NAV to anyone.

b. ***Proposed amendment***: Explicit allegations that the only injuries for which Plaintiffs seek recovery are injuries they sustained *before* Defendants made any representations to anyone about the price, value, Net Asset Value (NAV) or per share NAV of the Fund. *See* proposed First Amended Complaint ¶¶ 72-78.

   ***Defect in original allegations***: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *6 (5th Dist., Jan. 6, 2010) ("We reject the plaintiffs' argument that because the market-timing traders place their orders for the shares before the day's price is

published, the misrepresentation is not the basis of the plaintiffs' injury. It is precisely this timing that allegedly allows the market timers to profit at the expense of the plaintiffs.").

***How the proposed amendment cures the prior defect***: These amendments strictly limit Plaintiffs' claims to those based on Defendants' negligent execution of **only** those trade orders placed during regular trading hours and executed at the same time (i.e., after 4 p.m. Eastern and after Defendants set the NAV) and at the same price. These amendments also limit Plaintiffs' claims to **only** those injuries they sustained *before* Defendants ever made any representations (and thus "***mis***representations," if any) of NAV, per share NAV or price to anyone.

c.   ***Proposed amendment***: Explicit disavowal of *all* allegations of misrepresentation, omissions of material fact, deceit and/or manipulation (implicit or otherwise), and explicit allegations that Plaintiffs seek no recovery for any misrepresentation, omission of material fact, deceit and/or manipulation (implicitly or otherwise). *See* proposed First Amended Complaint ¶¶ 81-96. Plaintiffs thus forego any claim for injuries based on all such allegations, including even innocent misrepresentations, omissions or "manipulation."

***Defect in original allegations***: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *6 (5th Dist., Jan. 6, 2010) (agreeing with district court that allegations of misrepresentation or omissions are covered by SLUSA irrespective of whether defendants intended to deceive).

***How the proposed amendment cures the prior defect***: These amendments exclude any claim or allegations of, and preclude any recovery for, any misrepresentations, untrue statements, omissions, or other deceptive or manipulative conduct by Defendants (assuming there was any at all), and regardless of whether any such conduct may have been innocent, negligent, reckless, intentional or otherwise. Thus, Plaintiffs are not alleging any misrepresentations, untrue statements, omissions, or other deceptive or manipulative conduct, device, contrivance or scheme, irrespective of Defendants' state of mind (i.e., scienter).

d.   ***Proposed amendment***: Explicit allegations that Plaintiffs seek no recovery for injuries, if any, that Defendants may have caused by omissions, if any, in their prospectuses, marketing materials or anywhere else, and explicit disavowal of any claim that Plaintiffs were injured by Defendants' omissions, if any, in their

prospectuses, marketing materials or anywhere else. Plaintiffs specifically allege that the methods of calculating the NAV and its potential for dilution through market timing is information that was publicly available and in the public domain at all relevant times. Plaintiffs explicitly disavow any allegation that Defendants had any duty to disclose such information. Further, Plaintiffs have alleged Defendants did not fail to disclose any material information in their prospectuses, marketing materials or anywhere else. Plaintiffs have also alleged that, to the extent Defendants may have failed to disclose any material information contrary to Plaintiffs' allegations, Plaintiffs did not rely on them, Plaintiffs would have purchased shares of the Fund anyway, and that Plaintiffs would have paid the same price for those shares, even if Defendants had made additional disclosures. *See* proposed First Amended Complaint ¶¶ 68-71, 83-89.

**Defect in original allegations**: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *7 (5th Dist., Jan. 6, 2010) ("We also find, as did the district court in *Potter,* that the plaintiffs' allegations are based, at least implicitly, on the defendants' failure to disclose to the plaintiffs their method of calculating the NAV and the fact that this method has a potential to reward market-timing investors at the expense of long-term investors.").

**How the proposed amendment cures the prior defect**: These amendments exclude any implicit allegation that Defendants failed to disclose anything to Plaintiffs and exclude any claim based on such an omission.

e.  **Proposed amendment**: Explicit allegations disavowing any allegation of misrepresentations, untrue statements, omission, deceit or "manipulation" by anyone.

*See* proposed First Amended Complaint ¶¶ 89, 94-96.

**Defect in original allegations**: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *7 (5th Dist., Jan. 6, 2010) ("preclusion under the Securities Litigation Act also applies when class action claims are made under state law in connection with the purchases or sales of covered securities that coincide with alleged misrepresentations or omissions of fact by third parties").

*How the proposed amendment cures the prior defect*: These amendments exclude any claim or allegations of any conduct covered by SLUSA engaged in by third parties.

f.  ***Proposed amendment***: Explicit allegations disavowing any allegations of or claim for recovery for "arranged" market timing (if there was any) or other trading related to Defendants' preferential treatment (if there was any) of "favored insiders" or other illegal trading activities. Plaintiffs explicitly limit their claim strictly to those for injuries caused by "non-arranged" (and "inadvertent") market timing. *See* proposed First Amended Complaint ¶¶ 68-71.

*Defect in original allegations*: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *7 (5th Dist., Jan. 6, 2010) ("Here, it is conceivable that the plaintiffs' state law negligence claims could coincide with alleged securities fraud, because Rule 10b-5 of the Securities Exchange Commission prohibits market timing which 'is engaged in by favored market insiders at the expense of long-term mutual fund investors'"; "plaintiffs' claims that the defendants' negligent and willful and wanton conduct exposed them to market timers would include those market timers who engage in the market timing that is prohibited by Rule 10b-5") (citations omitted).

*How the proposed amendment cures the prior defect*: These amendments exclude market timing engaged in by favored market insiders or other market timing that is prohibited by Rule 10b-5, and more specifically, limits Plaintiffs' claims to those caused by legal market timing based only on publicly available information without any preferential treatment by Defendants and "inadvertent" market timing.

g.  ***Proposed amendment***: Explicit elimination of claims or allegations for injuries, if any, that Plaintiffs may have sustained by virtue of their purchase(s) or sale(s) of shares of the Fund. *See* proposed First Amended Complaint ¶ 99 ("Excluded from this First Amended Complaint are any claims based upon Defendants' conduct in connection with Plaintiffs' or any class member's purchase or sale of shares in the Fund.").

*Defect in original allegations*: *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 483 (7th Cir. 2005) (finding that the allegations of the *Spurgeon* complaint "avoids th[e] pitfall" of inadvertently including the plaintiff's and class members' purchases and sales through their class allegations).

*How the proposed amendment cures the prior defect*: Plaintiffs have adopted the *Spurgeon* class allegations verbatim. This amendment excludes any claim in connection with Plaintiffs' (or class members') own purchases or sales of mutual fund shares, and Plaintiffs make no allegation seeking to recover (and they do not seek to recover) the difference between what they paid for their mutual fund shares and some lower price they might have paid.

These and other amendments discussed below make clear that Plaintiffs do not allege or seek to recover the kind of damages recoverable in a securities fraud case, i.e., the difference between what a purchaser paid for a security and the lower price the purchaser would have paid (if any) but for some misrepresentation, untrue statement, omission, deceit or manipulative/deceptive device, contrivance or scheme.

h.  *Proposed amendment*: Explicit allegations of "corporate (or trust) mismanagement

and, more specifically, about corporate (or trust) negligence." *See* proposed First

Amended Complaint ¶¶ 1, 123-131 (Count I (for common law negligence).

*Defect in original allegations*: *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 482-83 (7th Cir. 2005) ("Plaintiffs do not contend that any *other* part of SLUSA is pertinent; in particular, they did not argue in their briefs—and did not maintain at oral argument despite the court's invitation—that their suits allege mismanagement rather than deceit or manipulation.").

*How the proposed amendment cures the prior defect*: These amendments limit Plaintiffs' claims exclusively to common law negligence (i.e., "mismanagement").

i.  *Proposed amendment*: Explicit allegations that Plaintiffs seek recovery only for

injury to their own separate property and not the Fund's property. Plaintiffs' make

specific factual allegations regarding the particular property that they owned and that

Defendants did not own. *See* proposed First Amended Complaint ¶¶ 97-99.

*Defect in original allegations*: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *7 (5th Dist., Jan. 6, 2010) ("the fact that the Securities Litigation Act expressly exempts state law class actions which are brought as derivative actions indicates that it was designed to extend broadly to actions in which the alleged mismanagement of a fund had caused a direct injury to the fund and only an indirect injury to the shareholders").

*How the proposed amendment cures the prior defect*: These amendments make clear that the **only** injuries for which Plaintiffs seek recovery are injuries to their own property which may be brought directly, rather than as shareholders' derivative actions. *See In re Mutual Funds Inv. Litig.*, 384 F.Supp.2d 873, 876 n.5 (D. Md.

2005) (mutual funds do not "have assets of their own but merely hold in trust securities (and cash) for the benefit of the mutual fund shareholders"); *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 1838 (1979) ("A mutual fund is a pool of assets, consisting primarily of portfolio securities, and ***belonging to the individual investors holding shares in the fund.***") (emphasis added).

j.  ***Proposed amendment***: Allegations that not all mutual fund shareholders suffer

dilution injuries and not all mutual fund shareholders are injured by Defendants'

negligent failure to prevent market timing. Accordingly, any recovery by a mutual

fund, in which Plaintiffs would only share on a pro rata basis, would fail to

compensate Plaintiffs fully for their dilution injuries and would unfairly compensate

other shareholders who did *not* sustain dilution injuries and were *not* injured by

market timing. Indeed, Plaintiffs would be forced to share their recoveries with some

shareholders who *profited* as a result of Defendants' failure to use a fair pricing

methodology and failure to prevent market timing. Plaintiffs' claims, as now limited,

are therefore not derivative in nature and are direct injuries for which they may seek

recovery directly. *See* proposed First Amended Complaint ¶¶ 100-111.

***Defect in original allegations***: *Kircher v. Putnam Funds Trust*, 2010 WL 108262 at *7 (5th Dist., Jan. 6, 2010) ("the fact that the Securities Litigation Act expressly exempts state law class actions which are brought as derivative actions indicates that it was designed to extend broadly to actions in which the alleged mismanagement of a fund had caused a direct injury to the fund and only an indirect injury to the shareholders").

***How the proposed amendment cures the prior defect***: These amendments make clear that Plaintiffs seek recovery for dilution injuries sustained by only some shareholders, injuries which were direct to them, and not for injuries sustained by Defendants and indirectly and derivatively by ***all*** shareholders of the Fund. (*See also* subparagraph (g) above (amendments eliminating claims for purchases and sales of mutual fund shares)). *See Abrams v. Van Kampen Funds, Inc.*, 2002 WL 1160171 at *12 (N.D. Ill. 2002) ("claim of breach of fiduciary duty based on inflated NAVs affecting new purchases may be brought directly" because "claim affects different shareholders differently and places shareholders in potential conflict with each other since an inflated NAV affects existing shareholders differently than new purchasers") (citing *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002)); *Mann v. Kemper Fin. Cos., Inc.*, 247 Ill.App.3d 966, 618 N.E.2d 317, 327 (1992) (allowing "individual [mutual fund]

shareholders [to] bring an action based upon violations of a duty owed directly to them" and "[a]s sellers of securities, defendants [mutual fund investment advisers] owed common-law fiduciary duties to individual investors"); *Sarin v. Ochsner*, 721 N.E.2d 932, 934 (Mass. App. Ct. 2000) (quoting *Litman v. Prudential-Bache Properties, Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992)) ("a shareholder may bring a direct action for injuries done to him in his individual capacity if he has an injury which is separate and distinct from that suffered by other shareholders").

22. By these amendments, Plaintiffs have excluded, eliminated and disavowed every allegation, implicit or otherwise, found in the allegations of their original complaint which have been held to run afoul of SLUSA. Plaintiffs have excluded, eliminated and disavowed every allegation that could be read to allege

- "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" (15 U.S.C. § 77p(b)(1)); or

- "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" (15 U.S.C.§ 78bb(f)(1)(A)); or

- "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security" (15 U.S.C. §§ 77p(b)(2) and 78bb(f)(1) (B)).

23. The only remaining question, now that all the perceived SLUSA-offending allegations have been eliminated (not only from Plaintiffs' allegations but even more broadly as any basis on which Plaintiffs rely even implicitly), is whether Plaintiffs have stated a viable cause of action for common law negligence.

24. Plaintiffs have alleged Defendants' duty of ordinary care, Defendants' breach of that duty in failing to prevent market timing, and Plaintiffs' injuries proximately caused by that breach.

25. Plaintiffs also propose to amend their Complaint to eliminate all allegations of recklessness or willful and wanton conduct in order to avoid Defendants' contentions (with

which Plaintiffs disagree) that SLUSA bars such allegations and to simplify the issues before the Court.

26. Defendants will not be unfairly prejudiced if Plaintiffs are granted leave to amend.

27. Accordingly, Plaintiffs should be granted leave to file their First Amended Complaint which is attached hereto.

KOREIN TILLERY

By:

STEPHEN M. TILLERY #2834995
10 Executive Woods Court
Swansea, IL 62226
Telephone: (618) 277-1180
Facsimile: (314) 241-3525

KLINT L. BRUNO #6257742
205 N. Michigan Avenue, Suite 1940
Chicago, Illinois 60601
Phone: (312) 899-5065
Fax: (312) 641-9555

ROBERT KING #6209033
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101
Direct: (314) 863-6902
Facsimile: (314) 863-7902

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the foregoing was caused to be served on the following counsel of record via electronic mail and by placing a true and correct copy of same in an envelope properly addressed with postage fully prepaid and by depositing said envelope in a United States Mail Box this 15th day of April, 2010.

Rebecca R. Jackson
BRYAN CAVE
211 North Broadway
One Metropolitan Square, Suite 3600
St. Louis, MO 63102

Charles L. Joley
DONOVAN ROSE NESTER & JOLEY, PC
8 East Washington Street
Belleville, IL 62220

John D. Donovan, Jr.
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624

James R. Carroll
Peter Simshauser
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
One Beacon Street
Boston, MA 02108-3194

Jeffrey B. Maletta
KIRKPATRICK LOCKHART PRESTON GATES ELLIS, LLP
1601 K Street, NW
Washington, DC 20006

Laura Steinberg
SULLIVAN & WORCESTER, LLP
One Post Office Square
Boston, MA 02109

By: _____
STEPHEN M. TILLERY

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

STEVE DUDLEY and BETH DUDLEY,     )
individually and on behalf of all others     )
similarly situated,     )
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,     )
　　　　　　　　　　　　　　　　　)
vs.     )　　No. 03-L-1539
　　　　　　　　　　　　　　　　　)
PUTNAM INTERNATIONAL EQUITY FUND, and     )
PUTNAM INVESTMENT MANAGEMENT, LLC,     )
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.     )

**FIRST AMENDED COMPLAINT**

COME NOW Plaintiffs STEVE DUDLEY and BETH DUDLEY, individually and on behalf of

all others similarly situated, by and through their undersigned counsel, and for their First Amended

Complaint against Defendants PUTNAM INTERNATIONAL EQUITY FUND and PUTNAM

INVESTMENT MANAGEMENT, LLC, state as follows:

**NATURE OF THE LAWSUIT**

1.　　This lawsuit is about corporate (or trust) mismanagement and, more specifically, about

corporate (or trust) negligence in a single aspect of the daily management of mutual funds:

Defendants' negligent failure to prevent market timing and dilution of Plaintiffs' and class

members' equity interests and investments in PUTNAM INTERNATIONAL EQUITY FUND.

Although Defendants took some measures to prevent market timing, including the use of pricing

methodologies known as "fair value pricing" on some occasions, the measures they took were

inadequate.

**THE PARTIES, JURISDICTION AND VENUE**

2.　　Plaintiffs STEVE and BETH DUDLEY are residents of East Alton, Illinois.

Case No. 03-L-1539
Page 1 of 26

EXHIBIT
#1

3.     At all relevant times, Plaintiffs STEVE and BETH DUDLEY have owned and held shares of Putnam International Growth Fund which, at the time of the original filing of this lawsuit, was known as PUTNAM INTERNATIONAL EQUITY FUND (hereinafter referred to as "Putnam International Equity" or "the Fund").

4.     Defendant PUTNAM INTERNATIONAL EQUITY is a Massachusetts business trust with its principal place of business in Boston, Massachusetts.

5.     Defendant PUTNAM INTERNATIONAL EQUITY does business in Illinois and is registered as a mutual fund in Illinois.

6.     At all relevant times, Defendant PUTNAM INTERNATIONAL EQUITY has promoted, marketed, and sold mutual fund shares to the investing public nationwide, including in Madison County, Illinois.

7.     At all relevant times, Defendant PUTNAM INTERNATIONAL EQUITY has maintained investor relationships nationwide, including in Madison County, Illinois.

8.     Defendant PUTNAM INTERNATIONAL EQUITY thus has significant contacts with Madison County, Illinois.

9.     Defendant PUTNAM INVESTMENT MANAGEMENT, LLC ("PUTNAM FUND MANAGER") is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

10.     Defendant PUTNAM FUND MANAGER is the investment manager for Defendant PUTNAM INTERNATIONAL EQUITY.

11.     As the investment manager for Defendant PUTNAM INTERNATIONAL EQUITY, Defendant PUTNAM FUND MANAGER operates and supervises most phases of the Fund's business, including the daily valuation of the fund portfolio.

12.   Defendant PUTNAM FUND MANAGER uses an interactive website to communicate with mutual fund shareholders, including those in Madison County, Illinois, regarding the performance of the Fund and the investments Defendant PUTNAM FUND MANAGER manages.

13.   Defendant PUTNAM FUND MANAGER manages shareholders' investments, including those owned by shareholders residing in Madison County, Illinois.

14.   As a result of its operation and supervision of Defendant PUTNAM INTERNATIONAL EQUITY, Defendant PUTNAM FUND MANAGER has significant contacts with fund shareholders in Madison County, Illinois.

15.   The events and transactions that are the subject of this lawsuit occurred in part in Madison County, Illinois.

16.   This Court has jurisdiction over the subject matter and, pursuant to 735 ILCS § 5/2-209, the parties.

17.   Venue is proper in this Court pursuant to 735 ILCS § 5/2-101.

MUTUAL FUND OWNERSHIP

18.   Mutual funds are investment vehicles that permit investors to pool their investments together for joint investment and management.

19.   A person (or entity) invests in a mutual fund by purchasing mutual fund shares.

20.   The monies investors use to purchase mutual fund shares are pooled together.

21.   Unlike a traditional corporation, a mutual fund holds those pooled monies separately from the mutual fund's own assets because the investors continue to be the real and beneficial owners of those monies.

22.   Unlike a traditional corporation, a mutual fund holds those monies nominally in its own name on behalf of and for the benefit of the investors.

23.   The mutual fund hires a fund manager to invest and manage the investors' pooled monies.

24.   The mutual fund manager uses those pooled monies to purchase a portfolio of securities that are likewise held nominally in the name of the mutual fund on behalf of and for the benefit of the mutual fund investors.

## HOW MUTUAL FUND SHARES ARE PRICED

25.   Unlike stocks, mutual fund shares are not traded on stock exchanges.

26.   Investors instead purchase mutual fund shares through an intermediary (such as a broker or retirement plan) from the mutual fund itself. Similarly, when investors no longer desire to own mutual fund shares, the mutual fund buys back or "redeems" those shares itself because there is no exchange on which the investor can sell those shares.

27.   Once each day after the close of U.S. markets at 4 p.m. Eastern Time, a mutual fund's manager sets the price at which fund shares are purchased and redeemed.

28.   To set the mutual fund's share price, the fund manager first values all the securities held in the mutual fund portfolio. The simplest and most often used methodology is based on the closing price of the stocks in the fund portfolio (which is the last trading price for a stock right before the exchange on which that stock is traded closed). For each stock in the portfolio, the fund manager multiplies a stock's closing price by the number of shares of that stock held in the portfolio, resulting in a value for each stock holding in the portfolio. The fund manager then totals those amounts to arrive at a total value for all the securities in the portfolio.

29.   Another methodology used to value the portfolio securities is called "fair value pricing." Sometimes events occurring after the close of a stock exchange can affect the value of a stock traded on that exchange. However, because such a stock cannot be traded while its exchange is closed, the stock's last trading price before the close of its exchange does not reflect the occurrence

of the event which would have affected the stock's trading price if the stock's exchange were open and the stock were trading. In this situation, the fund manager might not use the closing price for that stock, but might instead estimate the stock's fair value.

30.    The fund manager next deducts all liabilities of the fund portfolio (for example, the fund manager's investment management fees) from the total value of all the securities in the fund portfolio. The difference is called the Net Asset Value (or NAV) of the mutual fund.

31.    The fund manager then divides the NAV by the number of outstanding mutual fund shares, and the result is the price of an individual mutual fund share (or the per share NAV).

32.    The information in the foregoing paragraphs regarding how mutual fund shares are priced was publicly available and in the public domain at all relevant times.

## HOW MUTUAL FUND SHARES ARE TRADED

33.    Investors place trade orders to buy or redeem mutual fund shares throughout the course of a trading day during U.S. market hours (i.e., between 9:30 a.m. and 4 p.m. Eastern Time).

34.    The fund manager does not execute investors' trade orders to buy or redeem mutual fund shares until after the markets close at 4 p.m. Eastern Time.

35.    Before the fund manager executes trade orders for mutual fund shares, the fund manager sets the fund's NAV and the price per share (i.e., the per share NAV).

36.    The fund manager sets the daily NAV and new share price after the close of U.S. markets at 4 p.m.

37.    After the fund manager has set the new NAV and share price for that day, the fund manager then executes all trade orders at that new price (including market timers' trade orders [see paragraphs 52-56 below]).

38.   When the fund manager executes all trade orders placed that day (including market timers' trade orders) at the new NAV and share price, the fund manager has not represented, disclosed, published or otherwise communicated the new NAV or share price to anyone.

39.   Accordingly, investors (including market timers) do not know the precise share price at which their trade orders will be executed when they place their trade orders throughout the course of the trading day. Rather, investors (including market timers) only know what the previous day's share price was. Indeed, investors (including market timers) do not know the price at which their trade orders were executed until well after their trade orders have been executed.

### INTERNATIONAL MUTUAL FUNDS

40.   Some mutual funds hold securities in their portfolios that are securities of foreign companies and are traded on foreign stock exchanges rather than on U.S. stock exchanges.

41.   The home markets for such foreign securities include London, Paris, Frankfurt, Moscow, Singapore, Kuala Lumpur, Hong Kong, Taipei, Tokyo and Sydney.

42.   In setting the NAV on most trading days, Defendants use the last trade price in the home market of each of the foreign securities in the fund portfolio.

43.   Foreign stock exchanges are open for trading during different hours than U.S. markets.

44.   The trading hours of a foreign stock exchange may be completely different from U.S. trading hours (for example, the Tokyo exchange which trades between the hours of 8 p.m. and 2 a.m. Eastern Time) or its trading hours may partially overlap with U.S. trading hours (for example, the Paris exchange which closes at 11:30 a.m. Eastern Time).

45.   Foreign stock markets are located in time zones that are five to fifteen hours ahead of Eastern Time.

46.   Because many of the home markets for the foreign securities close hours before U.S. markets close at 4 p.m. Eastern Time, the closing prices of those foreign securities are 2 to 14.5 hours old by the time the fund manager sets the fund's new daily NAV and share price shortly after 4 p.m. Eastern Time, as detailed below:

a.   The exchange in Taipei, Taiwan observes normal trading hours of 9:00 a.m. to 1:30 p.m. local time (which is 1:30 a.m. Eastern time). When Defendants set the NAV, the closing prices of securities traded on the Taipei exchange have been static for 14.5 hours.

b.   The exchange in Sydney, Australia closes at 4:00 p.m. local time (which is 2:00 a.m. Eastern).

c.   The Tokyo exchange closes at 3:00 p.m. local time (2:00 a.m. Eastern).

d.   The exchange in Hong Kong closes at 4:00 p.m. local time (4:00 a.m. Eastern).

e.   The exchange in Kuala Lumpur, Malaysia closes at 5:00 p.m. local time (5:00 a.m. Eastern).

f.   The exchange located in Singapore closes at 5:00 p.m. local time (5:00 a.m. Eastern).

g.   The exchange located in Moscow, Russia closes at 7:00 p.m. local time (11:00 a.m. Eastern).

h.   The exchange located in Paris, France closes at 5:30 p.m. local time (11:30 a.m. Eastern).

i.   The exchange located in London, England closes at 4:30 p.m. local time (11:30 a.m. Eastern).

j.   The exchange located in Frankfurt, Germany closes at 8:00 p.m. local time (2:00 p.m. Eastern). When Defendants set the NAV, securities traded on the Frankfurt exchange have been static for 2 hours.

## INFLUENCE OF U.S. MARKETS ON FOREIGN MARKETS

47.    There is a direct correlation between movements in the U.S. stock markets and foreign stock markets. If U.S. stock markets rise after foreign markets have closed, foreign stock markets usually will also rise once trading begins the next day in those markets. Similarly, if U.S. stock markets decline, foreign stock markets usually will also decline the next day in those markets. Because of these direct correlations, the closing prices of foreign securities in a mutual fund portfolio may not reflect events that occurred after the close of the foreign markets.

48.    In this situation – when it is predictable that events occurring after the close of a foreign market(s) will cause the foreign securities' prices to rise or fall once trading begins the next day in the foreign market(s) – Defendants sometimes do not use the 2-to-14.5-hours-old closing prices to set a mutual fund's NAV, and instead sometimes use a fair value pricing methodology.

49.    When Defendants use a fair value pricing methodology to set the NAV, they estimate the price at which the foreign securities would then be trading if their stock exchanges were open, and Defendants use those estimated prices (or "fair value"), instead of those securities' closing prices, to set the NAV.

50.    Fair value pricing methodologies may vary from fund manager to fund manager. Fair value pricing requires a fund manager to exercise its judgment in estimating the fair value of the foreign securities. Thus, when a fund manager estimates the fair value of foreign securities, there is no single "true" fair value of those foreign securities or single "true" value of the assets held in the fund portfolio.

51.    Fair value pricing methodologies yield only a fund manager's best approximation of the value of the foreign securities and thus of the NAV as well.

## MARKET TIMING

52.   Although Defendants sometimes use fair value pricing to set a mutual fund's NAV, they do not fair value price in every instance in which an event(s) has occurred after the close of foreign markets that can be reasonably expected to have affected the price at which foreign securities in the fund portfolio could be trading (if their stock exchanges were open) at the time(s) the event(s) occurred.

53.   By failing to use fair value pricing in every such instance, Defendants sometimes exposed existing mutual fund investors to the investment diluting effect of a trading strategy known as "market timing."

54.   Market timers are investors who engage in short-term trading in mutual funds to take advantage of Defendants' failure to use fair value pricing more frequently.

55.   Market timers predict changes in the NAV generally based on a rise in U.S. stock markets when they occur after foreign markets have closed but before U.S. markets close.

56.   Market timers place orders to buy shares during U.S. market hours (like any other investor in mutual funds) on days when U.S. markets rise after foreign markets have closed. To derive maximum benefit from this trading strategy, market timers wait until just before the 4 p.m. deadline to place purchase orders for mutual fund shares.

57.   Due to Defendants' failure to use fair value pricing to set the NAV in every instance in which an event(s) has occurred after the close of foreign markets that can be reasonably expected to have affected the price at which foreign securities in the fund portfolio could be trading (if their stock exchanges were open) at the time(s) the event(s) occurred, the resulting NAV and mutual fund share price is lower than it would have been had Defendants used a fair value pricing methodology.

58.   Defendants execute all orders (including market timers' orders) to buy mutual fund shares on such days the same way they execute trade orders on any other day. As a result, purchase orders executed on such days result in sales of mutual fund shares at lower prices than they would have been executed had Defendants used a fair value pricing methodology.

59.   The general facts regarding the existence of market timing as a trading strategy and how that strategy works was publicly available and in the public domain at all relevant times.

**HOW MARKET TIMING DILUTES EXISTING MUTUAL FUND SHAREHOLDERS' EQUITY INTERESTS, AND THUS THEIR INVESTMENTS, IN A MUTUAL FUND**

60.   When Defendants executed purchase orders after using foreign securities' closing prices to set the NAV on days when a fair value pricing methodology would have yielded higher mutual fund share prices, Defendants' execution of those purchase orders at the lower price diluted existing shareholders' equity interests and thus their investments in the Fund.

61.   The following hypothetical illustrates how dilution happens.

Ten investors each own one share of a mutual fund. If the fund manager used fair value pricing to set the fund's NAV, the assets of the fund would be valued at $10 (and thus each share worth $1). However, the fund manager instead uses the closing prices of the foreign securities when setting the NAV, yielding an NAV of $5 (and thus each share worth only $0.50). An eleventh investor places a purchase order that day, and his order is later executed at the fifty-cent price. The following day, the foreign securities' prices rise (as fair value pricing would have predicted). As a result, when the fund manager sets the NAV after the close of U.S. markets that day, the NAV is valued at $10.50, representing the 10 original investors' investments worth $1 per share plus the additional $0.50 contributed by the eleventh investor. Now, however, each share is only worth ninety-five cents (i.e., $10.50 ÷ 11 shares). The original ten investors' share values thus drop by five cents per share, while the eleventh investor's share increases in value by 45 cents (from $0.50 to $0.95). This five-cent dilution of existing shareholders' investments (and the eleventh investor's 45-cent profit) does not result from the performance of the foreign securities nor from market fluctuations. Instead, the dilution results simply from the fund's failure to fair value price and from the sale of a mutual fund share based on foreign closing prices instead of fair value pricing.

62.   Market timers attempt to predict days when the closing price and fair value pricing methodologies would yield different mutual fund share prices. When market timers purchase mutual fund shares on such days, they are betting that Defendants will not employ a fair value pricing methodology. As alleged above, however, Defendants occasionally do use fair value pricing methodologies. When they do, they thwart the market timers' trading strategy and thereby protect existing shareholders from dilution on those days.

63.   In addition, dilution occurs irrespective of whether a purchaser intends to market time. Dilution occurs merely by virtue of a purchase of mutual fund shares on a day when fair value pricing would have yielded higher mutual fund share prices. On such days, the purchaser acquires a larger percentage of ownership interest of the mutual fund than the purchaser would have acquired had Defendants used a fair value pricing methodology to set the NAV. Thus, Defendants' failure to use a fair value pricing methodology more frequently not only exposes existing shareholders' investments to intentional market timing, but also to such unintended, "inadvertent market timing" as well.

64.   Defendants' use of the closing prices of foreign securities on such days instead of a fair value pricing methodology does not, in and of itself, dilute existing shareholders' equity and their investments. It is the combination of Defendants' use of the closing prices on such days and Defendants' execution of purchase orders for mutual fund shares at the new price based on those closing prices that dilutes existing shareholders' equity and their investments.

65.   Moreover, the dilution of existing shareholders' equity and their investments occurs immediately and irrevocably when Defendants execute purchase orders on such days, regardless of whether Defendants later publish each day's new NAV, per share NAV or share price.

66. This dilution in existing mutual fund shareholders' equity and their investments (and corresponding profit to mutual fund purchasers on such days) comes exclusively and dollar-for-dollar out of the pockets of the existing mutual fund shareholders.

67. The general facts regarding how investment dilution can occur in a mutual fund and that market timing can cause investment dilution was publicly available and in the public domain at all relevant times.

**THE MARKET TIMING ABOUT WHICH PLAINTIFFS COMPLAIN WAS BASED UPON PUBLICLY AVAILABLE INFORMATION AND WAS NOT THE RESULT OF DEFENDANTS' PREFERENTIAL TREATMENT OF THOSE MARKET TIMERS**

68. This lawsuit is limited exclusively to the kind of market timing engaged in by market timers who based their NAV predictions (and thus their decisions about when to purchase mutual fund shares) exclusively upon publicly available information, including information they acquired from monitoring foreign and U.S. markets.

69. Some mutual funds and their managers (including certain Putnam entities) have been accused of making arrangements with certain market timers, pursuant to which those market timers were allowed to engage in market timing in certain mutual funds and/or allowed to trade after-hours (so-called "late trading"). *See, e.g., In re Mutual Funds Inv. Litig.*, 590 F. Supp. 2d 741, 747 (D. Md. 2008) ("plaintiffs allege that the funds 'fail[ed] to disclose that they were permitting favored customers to engage in late trades and market-timed transactions'"). Such "arranged" market timing or "late trading" may have violated securities laws, but non-arranged (and inadvertent) market timing did not. This lawsuit is not based upon such "arranged" market timing or "late trading," and Plaintiffs seek no recovery for any dilution injuries they may have sustained as a result of such "arranged" market timing or "late trading," to the extent those kinds of trading may have occurred.

70.     Similarly, this lawsuit is not based upon any market timing that may have resulted from any kind of preferential treatment that Defendants may have given, if any, to any investors including but not limited to any market timers. Instead, this lawsuit is based exclusively upon the kind of market timing that anyone could have engaged in based upon publicly available information they could have acquired from the public domain, including from monitoring foreign and U.S. markets.

71.     Specifically, this lawsuit is based upon Defendants' failure to prevent existing shareholders' dilution injuries resulting from i) market timing by market timers who had no market timing arrangements with Defendants, and ii) purchases of mutual fund shares by investors who did not intend to market time the Fund but nevertheless unwittingly "market timed" the Fund by making purchases on days when Defendants' use of a fair value pricing methodology would have prevented such dilution.

## PLAINTIFFS' CLAIMS ARE NOT BASED UPON ANY REPRESENTATIONS, STATEMENTS OF FACT, OMISSIONS OR "MANIPULATION"

*Plaintiffs' claims are not based in any way upon, and are completely independent of, the publication, representation, disclosure or other communication, if any, of the NAV or per share NAV*

72.     Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit resulted exclusively from the combination of: i) Defendants' use of the closing prices of foreign securities on days on which an event(s) occurred after the close of foreign markets that could have been reasonably expected to have affected the price at which foreign securities in the fund portfolio would have been trading (if their stock exchanges were open) at the time(s) the event(s) occurred, and ii) the execution of purchase orders at the share price based on that NAV.

73.   Although on any given day Defendants may have published (or represented, disclosed, or otherwise communicated) the new NAV or per share NAV (i.e., the per share price), if they did so, they did not publish (or represent, disclose, or otherwise communicate) the new NAV or per share NAV to anyone until: i) after the fund manager set the new NAV or per share NAV, and ii) after the fund manager executed all trade orders (including market timers' and all other purchasers' trade orders), and iii) after existing shareholders' dilution injuries were complete.

74.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit were thus always complete before Defendants' publication, representation, disclosure, or other communication (if any) of the new NAV or per share NAV to anyone.

75.   Because investors (including market timers) do not learn the NAV or per share NAV at which their trade orders are executed until after Defendants execute those trade orders at the new per share NAV (as alleged above), it was impossible for anyone (including Plaintiffs, class members, or any other investors including market timers) to rely on the new NAV or per share NAV in placing their orders to purchase, redeem and/or continue to hold mutual fund shares.

76.   Defendants' subsequent publication (or representation, disclosure or other communication), if any, of the new NAV or per share NAV did not dilute existing shareholders' equity interests or investments and did not otherwise injure existing shareholders like Plaintiffs and class members.

77.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit were thus not caused by or related in any way to Defendants' subsequent publication, representation, disclosure or other communication (whether negligent or intentional), if any, of the NAV or per share NAV.

78.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit would have occurred even if Defendants never published, represented, disclosed or otherwise communicated the NAVs or per share NAVs that made the dilution injuries possible.

*Plaintiffs' claims are not based upon any representations or statements of fact, whether true or false (in whole or in part), made by anyone to anyone else at any time and are therefore not based upon any misrepresentations or untrue statements of fact*

79.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit were not caused by any statements or representations (whether true or false, in whole or in part) which Defendants or anyone else may have made at any time, including but not limited to any statements or representations Defendants may have made in a prospectus (including any statement of additional information) or other marketing materials.

80.   Every time Defendants used foreign securities' closing prices to set an NAV, Defendants always used the actual, true closing prices of those securities.

81.   To the extent Defendants may have stated or represented (in a prospectus, statement of additional information, marketing materials or anywhere else) that they would use a fair value pricing methodology from time to time and/or that they would implement other measures to prevent or deter market timing in the Fund, Plaintiffs do not allege that any such statement or representation was untrue, misleading or deceptive. To the contrary, to the extent Defendants made any such statements or representations, Defendants actually intended (at the time they made such statements or representations) to use a fair value pricing methodology from time to time and/or to implement other measures to prevent or deter market timing in the Fund. Furthermore, Defendants actually did use a fair value pricing methodology from time to time and/or implemented other measures to prevent or deter market timing in the Fund.

82.   To the extent Defendants may have published, represented, disclosed or otherwise communicated a new NAV or per share NAV, Defendants always published, represented, disclosed or otherwise communicated the actual NAV or per share NAV that Defendants set and used to execute all trade orders.

*Plaintiffs' claims are not based upon Defendants' failure to disclose any facts*

83.   The first mutual funds in the U.S. came into existence in the 1920's. How mutual fund shares are priced is thus information that has long been publicly available and in the public domain. Similarly, knowledge of market timing and how that trading strategy dilutes the equity interests and investments of existing shareholders is information that was publicly available and in the public domain at all relevant times.

84.   Accordingly, Plaintiffs do not allege that Defendants had any duty to disclose such facts.

85.   Plaintiffs do not allege that Defendants had any duty to disclose or that Defendants failed to disclose any facts regarding:

    a.   fund assets are valued once per day;

    b.   once per day valuation of fund assets could expose the Fund to market timing;

    c.   market timing in a mutual fund dilutes the equity interests and investments of existing shareholders;

    d.   the pricing methodologies Defendants use to set the Fund's NAV or per share NAV;

    e.   when or under what circumstances Defendants would use the closing prices of foreign securities to set the NAV or per share NAV; or

    f.   when or under what circumstances Defendants would use a fair value pricing methodology to set the NAV or per share NAV.

86.   To the extent Defendant may have had any duty to disclose but failed to disclose any of the facts as alleged in the preceding paragraph:

a.   Such omissions (if any) could not and thus did not have any effect on the price of shares of the Fund; and

b.   Plaintiffs and class members did not rely on any such omissions, whether in a prospectus (including any statement of additional information), other marketing materials, or anywhere else; and

c.   Plaintiffs and class members would still have purchased shares of the Fund had Defendants made such disclosures they may have failed to make, if any; and

d.   Plaintiffs and class members would have purchased shares of the Fund at the exact same prices they did in fact pay, even if Defendants had made any disclosure they may have failed to make, if any.

87.   Moreover, to the extent Defendants may have disclosed that they would use a fair value pricing methodology from time to time, Defendants could not have disclosed with any greater specificity when or under what circumstances they would use a fair value pricing methodology because Defendants' decisions regarding when to use their fair value pricing methodology were based upon the totality of market conditions and not a specific set of criteria that dictated the use of a fair value pricing methodology.

88.   Thus, this lawsuit is not based upon Defendants' failure to disclose any fact, in their prospectuses (including any statement of additional information), marketing materials, or otherwise. Instead, this lawsuit is based upon Defendants' failure to prevent the kind of market timing and dilution that are the subject of this lawsuit.

89.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit were not caused by anyone's failure to disclose (or anyone's omission of) any facts (material or otherwise) at any time, including but not limited to Defendants' omissions or failures to disclose any material fact in prospectuses (including any statement of additional information), marketing materials or anywhere else.

*Plaintiffs do not claim any "manipulation" or manipulative or deceptive devices, contrivances or schemes*

90.   Defendants did not engage in the pricing practices of which Plaintiffs complain with any intention to mislead or deceive any investor in any way, including with respect to any investors' decision to purchase, continue to hold, or redeem shares of the Fund.

91.   Moreover, Defendants' pricing practices did not mislead or deceive any investor in any way, including with respect to any investors' decision to purchase, continue to hold, or redeem shares of the Fund.

92.   Defendants lacked any motive, including any financial gain, for not preventing the kind of market timing which is the subject of this lawsuit. The kind of market timing which is the subject of this lawsuit injured Plaintiffs but did not profit Defendants financially or otherwise.

93.   Existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit resulted exclusively from Defendants' use of their usual method for setting NAV (based on the closing prices of foreign securities) on days when a fair value pricing methodology would have yielded a higher mutual fund share price, plus Defendants' execution of all purchase orders (including market timers' and all other investors' purchase orders) at the price Defendants set based on the closing prices of foreign securities.

94.   Plaintiffs thus do not allege and their claims are not based upon any allegation that Defendants or anyone else engaged in any "manipulation" or manipulative or deceptive devices, contrivances or schemes.

95.   To the contrary, neither Defendants nor anyone else engaged in any "manipulation" or manipulative or deceptive devices, contrivances or schemes, and no "manipulation" or manipulative or deceptive devices, contrivances or schemes contributed to Plaintiffs' or class members' dilution injuries in whole or in part.

96.   Accordingly, existing mutual fund shareholders' dilution injuries which are the subject of this lawsuit were not caused by anyone misleading or deceiving anyone else about anything at any time by any means.

### MARKET TIMING DOES NOT INJURE THE FUND'S PROPERTY, AND PLAINTIFFS' ASSERT CLAIMS FOR INJURIES ONLY SOME SHAREHOLDERS SUSTAINED, SO PLAINTIFFS' CLAIMS ARE NOT SHAREHOLDERS' DERIVATIVE CLAIMS

97.   Because investors' pooled investments in the Fund are the separate property of the investors and not the property of the Fund (as alleged above), the dilution injury existing mutual fund shareholders sustain from market timing is not an injury to the Fund's property but instead is to the shareholders directly.

98.   Because the securities in the fund portfolio are likewise held nominally in the name of the mutual fund on behalf of and for the benefit of the mutual fund investors, the dilution injury existing mutual fund shareholders sustain from market timing is not an injury to the Fund's property but instead is to the shareholders directly.

99.   The market timing which is the subject of this lawsuit does not injure Defendants or Defendants' own property, other than the property Defendants hold nominally in its own name on

behalf of and for the benefit of investors. To the contrary, sales of the Fund's shares to market timers *increased* the assets in the fund portfolio.

100. In addition, not all shareholders of the Fund suffered the dilution injuries which are the subject of this lawsuit.

101. Only existing mutual fund shareholders who continued to hold their shares of the Fund suffered the dilution injuries caused by the market timing Defendants failed to prevent.

102. Existing mutual fund shareholders who redeemed shares on a day when a fair value pricing methodology would have yielded higher mutual fund share prices suffered a different injury as a result of their redemption(s) in a different amount than the dilution injury suffered by existing shareholders who continued to hold.

103. Existing mutual fund shareholders who redeemed shares on such a day did not suffer a dilution injury.

104. Existing mutual fund shareholders who redeemed shares on such a day were not injured by Defendants' failure to prevent market timing.

105. Existing mutual fund shareholders who redeemed shares on such a day were instead injured exclusively by Defendants' failure to use a fair value pricing methodology. In the ten investor hypothetical described above, if one of the ten original investors redeemed his share on the day when the NAV was set at $5 (using closing prices of foreign securities rather than a fair value pricing methodology) yielding a per share NAV of $0.50, that investor's loss would have been fifty cents, which is different in amount from the hypothetical five cent dilution injury. In addition, the redeeming investor would have sustained that loss even if there were no sales of the Fund's shares that day, i.e., the redeeming investor would have sustained that loss even if there had been no market timing in the Fund (in which case the existing shareholders who continued to hold would not

have suffered any dilution injury even though the redeeming investor did). Such redemption injuries are therefore entirely independent of the dilution injuries which are the subject of this lawsuit and of Defendants' failure to prevent market timing. Plaintiffs make no claim and seek no recovery for any such redemption injuries they or class members may have sustained.

106. New mutual fund shareholders who purchased on a day when fair value pricing would have yielded higher mutual fund share prices (i.e., both non-arranged market timers and "inadvertent" market timers), suffered no injury on such days. To the contrary, such new mutual fund shareholders profited from Defendants' use of closing prices to set the NAV on such days.

107. Unlike existing mutual fund shareholders, new mutual fund shareholders were thus not injured by Defendants' failure to use a fair value pricing methodology on such days (indeed they profited from it).

108. Unlike existing mutual fund shareholders who continued to hold, new mutual fund shareholders were not injured by Defendants' failure to prevent market timing on such days (indeed they profited from it).

109. As a result, not all mutual fund shareholders suffered the dilution injury existing shareholders sustained which are the subject of this lawsuit and which resulted exclusively from the combination of: i) Defendants' use of the closing prices of foreign securities on days on which an event(s) occurred after the close of foreign markets that could have been reasonably expected to have affected the price at which foreign securities in the fund portfolio would have been trading (if their stock exchanges were open) at the time(s) the event(s) occurred, and ii) the execution of purchase orders at the share price based on that NAV.

110. Any recovery by the Fund itself would not, and could never, fully compensate Plaintiffs and class members for the direct dilution injuries they sustained (and which the Fund did not)

because a portion of their recovery would necessarily be shared with other shareholders who sustained no dilution injury, some of whom actually profited (whether they intended to or not) by Defendants' failure to prevent market timing.

111. Thus, the dilution injuries which are the subject of this lawsuit were direct injuries only to existing mutual fund shareholders who continued to hold, like Plaintiffs and class members, and not to the Fund or the Fund's separate property. Plaintiffs accordingly bring this lawsuit as a direct action and not as a shareholders' derivative action.

## CLASS ACTION ALLEGATIONS

112. Plaintiffs, individually and on behalf of a class of all persons who have owned shares in the Fund since the applicable limitations period prior to the original filing of this lawsuit, bring this lawsuit as a class action against Defendants.

113. Excluded from this First Amended Complaint are any claims based upon Defendants' conduct in connection with Plaintiffs' or any class member's purchase or sale of shares in the Fund.

114. Plaintiffs are members of the class and will fairly and adequately assert and protect the interests of the class.

115. Plaintiffs' interests are coincident with, and not antagonistic to, those of other class members.

116. Plaintiffs have retained attorneys who are experienced in class action litigation.

117. Members of the class are so numerous that joinder of all members is impracticable.

118. Common questions of law or fact predominate over any questions affecting only individual members of the class. Common questions include, but are not limited to, the following:

    a.  whether Defendants failed to prevent market timing in the Fund;

b.  whether Defendants failed to prevent the dilution of Plaintiffs' and class members' equity interests and investments in the Fund;

c.  whether Defendants were negligent in failing to prevent market timing in the Fund;

d.  whether Defendants were negligent in failing to prevent the dilution of Plaintiffs' and class members' equity interests and investments in the Fund;

e.  whether Defendants' negligent failure to prevent market timing in the Fund, or the dilution of Plaintiffs' and class members' equity interests and investments in the Fund, caused damage to Plaintiffs and class members; and, if so,

f.  the extent of such damages.

119. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, and/or adjudication with respect to individual class members, which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

120. The class action method is appropriate for the fair and efficient prosecution of this action.

121. Individual litigation of all claims, which might be brought by all class members would produce a multiplicity of cases so that the judicial system would be congested for years. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising from Defendants' conduct.

122. The certification of a class would allow litigation of claims that, in view of the expense of the litigation, may be insufficient in amount to support separate actions.

## COUNT I
## (COMMON LAW NEGLIGENCE)

123. Plaintiffs repeat and incorporate by reference paragraphs 1 through 122 as if fully set forth herein.

124. Defendants held themselves out to the investing public, either directly or impliedly, as (and they were, in fact) skilled specialists in the field of investment management, possessing the knowledge, skill and care ordinarily used by reasonably well-qualified members of their profession.

125. It thereby became Defendants' duty to exercise that degree of knowledge, skill and care ordinarily used by reasonably well-qualified members of their profession.

126. Defendants may have represented, in their prospectuses (including any statement of additional information) and/or other marketing materials, that they would use a fair value pricing methodology from time to time.

127. Defendants took some measures to prevent market timing and dilution, including the use of fair value pricing from time to time.

128. The measures Defendants took to prevent market timing and dilution were inadequate.

129. Defendants could have taken, but did not, additional actions to prevent market timing in the Fund and the dilution of Plaintiffs' and class members' equity interests and investments in the Fund, including but not limited to:

    a.  using a fair value pricing methodology more often to set the NAV and mutual fund share price;

    b.  levying fees on short-term trading in the Fund;

    c.  adopting a front-end-load charge; and/or

    d.  reducing the number of trades any investor can execute.

130. Defendants' failure to take additional actions to prevent market timing in the Fund and the dilution of Plaintiffs' and class members' equity interests and investments in the Fund was negligent.

131. Defendants' negligence as alleged above proximately caused Plaintiffs and class members to sustain dilution damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs request the Court to order that this action be maintained as a class action and enter judgment in favor of Plaintiffs and the class against Defendants PUTNAM INTERNATIONAL EQUITY FUND and PUTNAM INVESTMENT MANAGEMENT, LLC, and award Plaintiffs and the class compensatory damages, prejudgment interest, costs of suit, and such other relief as is appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

KOREIN TILLERY

By: _____
STEPHEN M. TILLERY #2834995
10 Executive Woods Court
Swansea, IL 62226
Telephone: (618) 277-1180
Facsimile: (314) 241-3525

KLINT L. BRUNO #6257742
205 N. Michigan Avenue, Suite 1940
Chicago, Illinois 60601
Phone: (312) 899-5065
Fax: (312) 641-9555

ROBERT KING #6209033
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101
Direct: (314) 863-6902
Facsimile: (314) 863-7902

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the foregoing was caused to be served on the following counsel of record via electronic mail and by placing a true and correct copy of same in an envelope properly addressed with postage fully prepaid and by depositing said envelope in a United States Mail Box this 15th day of April, 2010.

Rebecca R. Jackson
BRYAN CAVE
211 North Broadway
One Metropolitan Square, Suite 3600
St. Louis, MO 63102

Charles L. Joley
DONOVAN, NESTER & JOLEY, PC
8 East Washington Street
Belleville, IL 62220

James R. Carroll
Peter Simhauser
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Beacon Street
Boston, MA  02108

John D. Donovan, Jr.
ROPES & GRAY LLP
One International Place
Boston, MA 02110

Jeffrey B. Maletta
KIRKPATRICK LOCKHART PRESTON GATES ELLIS LLP
1601 K Street, N.W.
Washington, DC  20006

Laura Steinberg
SULLIVAN & WORCESTER, LLP
One Post Office Square
Boston, MA  02109

By: _____
STEPHEN M. TILLERY